IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA L. HARGROVE, | ) | CASE NO. 5:15CV707 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Angela Hargrove ("Hargrove") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

On December 5, 2011, Hargrove filed an application for DIB and SSI, alleging a disability onset date of December 19, 2009.  Tr. 12, 155, 161.  She alleged disability based on the following: post-traumatic stress disorder and depression.  Tr. 199.  After denials by the state agency initially (Tr. 83, 84) and on reconsideration (Tr. 109, 110), Hargrove requested an administrative hearing.  Tr. 133.  A hearing was held before Administrative Law Judge ("ALJ")

1

Jeffrey Raeber on August 23, 2013.  Tr. 29-58.  In his December 4, 2013, decision (Tr. 12-21),

the ALJ determined that there are jobs that exist in significant numbers in the national economy

that Hargrove can perform, i.e., she is not disabled.  Tr. 20.  Hargrove requested review of the

ALJ's decision by the Appeals Council (Tr. 7) and, on February 10, 2015, the Appeals Council

denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Hargrove was born in 1972 and was 39 years old on the date her application was filed.

Tr. 206.  She previously worked as a sales clerk at a store, telemarketer, tutor, babysitter, and

performed office work for a temporary agency.  Tr. 33-38.  She has an associate's degree.  Tr.

44.

### B.  Relevant Medical Evidence[1]

On February 3, 2010, Hargrove saw psychiatrist Raman Baishnab, D.O.  Tr. 590-595.

She complained of depression, anxiety, and panic attacks.  Tr. 590.  She reported trauma

following a physical assault at a bar in December 2009.  Tr. 590.  Upon initial evaluation, Dr.

Baishnab observed that Hargrove was moderately depressed and moderately anxious.  Tr. 594.

She had a restricted affect, decreased eye contact, was hypoactive, and mildly unkempt.  Tr. 594.

She was alert, oriented, and her thought process was intact.  Tr. 594.  Dr. Baishnab diagnosed

depression and anxiety and prescribed medication and a follow-up visit.  Tr. 595.  Hargrove

returned on February 24, 2010.  Tr. 593.  She described other past trauma such as childhood

abuse and witnessing a shooting at age 18.  Tr. 593.

---

[1]  Hargrove only challenges the ALJ's decision with respect to her mental impairments. *See* Doc. 15. Accordingly, only the medical evidence relating to Hargrove's mental impairments is summarized herein.

On October 14, 2010, Hargrove visited the Summa Center for Treatment and Study of Traumatic Stress (CTSTS) upon referral from Dr. Baishnab to treat her depression and anxiety. Tr. 522, 532-533.  She was assigned to therapist Kate Benson, M.A.  Hargrove reported that her traumatic stress symptoms began after her assault in December 2009.  Tr. 532.  She complained of anhedonia, decreased appetite, sleep disturbance, and chronic fatigue.  Tr. 532.  She presented with a depressed mood, extreme anxiety and hypervigilance; she was also frequently tearful during the interview.  Tr. 532.  She was diagnosed with posttraumatic stress disorder (PTSD) and major depressive disorder, with findings of depressed mood, anhedonia, and a loss of sleep, appetite, and energy.  Tr. 522, 533.  Ms. Benson prescribed weekly individual sessions for 24 weeks.  Tr. 522.

Treatment notes from CTSTS from October 2010 through May 2011 indicate that Hargrove generally presented with mild to moderate depression and moderate anxiety and that she was well groomed and had a full affect, normal eye contact, spontaneous demeanor, and mild anhedonia, Tr. 477, 479, 481, 483, 485, 487, 489, 491, 493, 495, 497, 503, 505, 507, apart from two instances of severe symptoms of depression and anxiety on November 18 and December 2, 2010.  Tr. 499, 501.  On November 18, 2010, she reported that her house was robbed and that she was staying at her cousin's house.  Tr. 501.  On January 17, 2011, she reported that she moved out of her cousin's house, was living on her own again, and felt safer in her new home. Tr. 497.  Throughout this time, Hargrove attended school and successfully completed a degree program.  Tr. 485, 489, 503.  In March 2011 she obtained an externship and was enjoying the work.  Tr. 483, 485.  In April 2011 she was working at her externship 5 days a week, worked at a store on the weekends, and her niece had moved in with her.  Tr. 477, 479.  She reported that she continued to struggle with difficulties sleeping.  Tr. 481.

On May 26, 2011, Hargrove's case was transferred to a new therapist and she saw clinical psychologist Erin Farrer, Ph.D.  Tr. 468, 576-577.  She was tearful at her first session because she was unsure about seeing a new therapist; she reported taking a long time to warm up to people.  Tr. 576.  On June 2, 2011, Hargrove reported that she almost canceled her session because she feared leaving the house, but that she came because she had promised to do so the prior session and because she hoped for a change in her symptoms.  Tr. 574.  Dr. Farrer assessed PTSD and major depressive disorder, moderate and recurrent.  Tr. 574, 576.

On June 9, 2011, Hargrove reported to Dr. Farrer that she was mildly depressed and mildly anxious.  Tr. 572.  She brought her 8-month-old nephew to the appointment and stated that she had attended a field day, though it had made her anxious, and that she was pleasantly surprised after reaching out to a friend.  Tr. 572.  The following week Hargrove reported severe symptoms and was very tearful and kept her eyes covered during the session (Tr. 570); on June 30, 2011, Hargrove was "in a noticeably better mood" and reported that she had three job interviews that had gone well.  Tr. 568.  On July 14, 2011, Hargrove felt "beat down" and discouraged; she had not heard back from her job interviews.  Tr. 566.  The following week she was very upset and tearful because she had not yet received her degree in the mail although everyone else had.  Tr. 564.  Hargrove continued to exhibit severe symptoms in August 2011.  Tr. 560, 562.  Despite these symptoms, she continued working in her cousin's store and with Dr. Farrer on organizing her resume and job search process.  Tr. 556, 558, 560.

In October 2011 Hargrove reported spending time with her nephew, which she enjoyed.  Tr. 550.  She obtained a volunteer position at a food bank.  Tr. 544, 546.  On December 21, 2011, she stated that she had met with her attorney regarding expunging her legal record so that

she could obtain a job.  Tr. 536.  She was planning to spend Christmas with her mother and was working on a puzzle.  Tr. 536.

On January 4, 2012, Hargrove stated that she was feeling better and that she attended a football game the past weekend; she watched the game for a half hour in the stands then watched the rest of the game from the bathroom.  Tr. 534.  She was working on a puzzle at home and discussed inviting people over.  Tr. 534.  She stated that she feels lonely when she is alone and that her thoughts wander.  Tr. 534.

On March 3, 2012, Hargrove returned to Dr. Baishnab.  Tr. 603-610.  She stated, "I need to stop being a crybaby."  Tr. 603.  Upon examination, Hargrove was cooperative, unkempt, and withdrawn.  Tr. 607.  Her mood was depressed and she had a constricted affect.  Tr. 607.  She had been working "on and off" at her cousin's convenience store but quit in February because she felt underpaid and exploited by her cousin.  Tr. 604.  She reported suicidal ideation but noted that she had concern for her nieces and nephews and that she had two close protective friends.  Tr. 608.  She was planning to spend the weekend at her cousin's house.  Tr. 610.  Dr. Baishnab diagnosed her with major depressive disorder, severe, recurrent, and PTSD.  Tr. 608-609.  He assigned a GAF of 43 and increased her medication dosage.[2]  Tr. 609.

On June 1, 2012, Hargrove reported to Dr. Baishnab that her depressive symptoms had improved with increased medication.  Tr. 611, 614.  She felt less isolated and was "able to let go of things easier."  Tr. 614.  She had reengaged with some family and friends and had attended

---

[2]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

church with friends.  Tr. 614.  She had been babysitting her one-year-old nephew "for a few days every other week."  Tr. 614.

On June 13, 2012, Hargrove told Dr. Farrer that she had attended her friend's grand opening of a bar but was upset with herself because she only stayed for five minutes.  Tr. 665. She and Dr. Farrer discussed places she wanted to go other than a bar, and Hargrove mentioned wanting to take her nieces and nephews to the park and that she would look into finding a park to take them to.  Tr. 665.

On July 18, 2012, Hargrove saw Dr. Farrer with a severely depressed mood and anxiety. Tr. 663.  Dr. Farrer noted that, although Hargrove appeared depressed, she was more open about her feelings.  Tr. 663.  She reported seeing her nephew and her friends the previous week and that this helped her depression.  Tr. 663.  She also stated that volunteering made her feel more accepted.  Tr. 663.  She spoke about a book that she began to read and brought it in to share.  Tr. 663.  She reported experiencing the urge to cut herself but stated that she did not do so, did not want to do so, and had never done so.  Tr. 663.

On August 3, 2012, Hargrove went to the emergency department complaining of hip pain recently exacerbated because she was working at a job that required her to be "on her feet all day for 8-10 hours at a time."  Tr. 625.  Upon examination, Hargrove was alert, oriented, pleasant, and conversational.  Tr. 631.  Later that month, Hargrove reported to Dr. Farrer that she had been watching her nephew for the week.  Tr. 661.  She felt very depressed but felt better when she thought about her nephew.  Tr. 660.  She kept all her appointments.  Tr. 660.  She mentioned suicidal ideation but had no intent; she stated that her friends would be upset if something were to happen to her.  Tr. 660.

On August 29, 2012, Hargrove presented as very depressed at her appointment with Dr. Farrer and expressed suicidal thoughts.  Tr. 659.  Dr. Farrer encouraged Hargrove to seek emergency treatment, offered to walk down with her to the emergency room, and, when Hargrove instead left the building, Dr. Farrer called security and 911 and requested the authorities find Hargrove and bring her to the emergency room.  Tr. 659.  They did so.  Tr. 676.  Hargrove was admitted involuntarily and hospitalized until August 31, 2012.  Tr. 676.  At discharge, the attending physician noted that Hargrove's admission was related to events earlier that day and that she had deteriorated over the past 1 to 2 months.  Tr. 676.  The physician reported that Hargrove still enjoyed caring for children and that she baby-sat for family members.  Tr. 676.  She denied feeling suicidal or reporting that she was suicidal.  Tr. 676.  At discharge, Hargrove stated that she had gained perspective about improving her condition and felt reassured that Dr. Farrer had admitted her.  Tr. 677.  She was "much calmer[] and significantly more oriented to her [] future."  Tr. 677.

Following her hospitalization, Hargrove told Dr. Farrer that she realized that "people care more than she thought."  Tr. 658.  She wanted to take care of herself and planned to begin tutoring in order to become more active during the day.  Tr. 655.  On October 24, 2013, Hargrove reported feeling happy and recounted that she attended a festival over the weekend and "had a great time."  Tr. 654.  On January 10, 2013, she told Dr. Farrer that she enjoyed having people over to her house for Christmas, although she "was ready for them to leave after a while."  Tr. 649.  Later that month she attended her nephew's basketball game for 15 minutes and went to the grocery store with her friend.  Tr. 647.  She continued tutoring, but reported on February 7, 2013, that the family was going through a divorce and she was not sure if she would continue working for them.  Tr. 646.

On March 7, 2013, Hargrove told Dr. Farrer that she had been doing "nothing;" Dr. Farrer "challenged this statement" and discussed how she had gone grocery shopping, gotten a new puzzle, spent time with her nephew, and gotten her car fixed.  Tr. 645.  They discussed Hargrove's self-perception about what she does.  Tr. 654.  On April 18, 2013, she reported that she was planning on spending time that weekend with some friends, watching her nephew, and attending church.  Tr. 642.  The next session, she reported that she had spent time with her friends and nephew and had also gone out to meet a friend for half an hour.  Tr. 641.  She had been taking care of her cousin's children.  Tr. 641.  On May 16, 2013, Hargrove reported that her cousin was in the hospital after a serious car accident and that she was caring for her cousin's children at her cousin's house; she felt uncomfortable being in their house.  Tr. 640.

### C.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On January 6, 2012, Dr. Baishnab completed a Mental Status Questionnaire on behalf of Hargrove.  Tr. 583-585.  He listed Hargrove's mood as depressed, her affect constricted, and that she was tearful.  Tr. 583.  Her orientation and cognitive functioning were intact and her insight and judgment were fair.  Tr. 583.  He listed her diagnoses as major depressive disorder and chronic PTSD.  Tr. 584.  He opined that Hargrove's abilities to remember, understand, and follow directions were intact, as well as her abilities to maintain attention, sustain concentration, persist at tasks, and complete tasks in a timely fashion.  Tr. 584.  In terms of social interaction and adaptation, Dr. Baishnab explained that Hargrove had difficulty being around groups due to past trauma and that she adapts by avoiding people and crowded places and that she did not tolerate having her back to others.  Tr. 584.  Regarding her ability to react to pressures in a work setting involving simple, routine tasks, Dr. Baishnab opined that Hargrove would be "fragile"

when working with others but proficient when alone.  Tr. 584.  He reported that medication provided minimal improvement of Hargrove's symptoms.  Tr. 584.

On the same day, Dr. Baishnab filled out a Daily Activities Questionnaire.  Tr. 586-587. He wrote that Hargrove lived alone in her apartment and had no behaviors or deficits that prevented independent living.  Tr. 586.  He indicated that she got along poorly with others due to low self-esteem, fear of others and lack of trust.  Tr. 586.  He noted that, while working, Hargrove engaged in only minimal socializing but that she was compliant with work needs and expectations.  Tr. 586.  She had poor stress tolerance in interpersonal relationships.  Tr. 586.  She sent others to shop for her and could not tolerate public transportation, but her abilities to perform daily activities, including food preparation, household chores, personal hygiene, and bill paying, were intact, and she did puzzles as a hobby.  Tr. 587.

On December 27, 2011, Dr. Farrer completed a Mental Status Questionnaire on Hargrove's behalf.  Tr. 468-471.  Dr. Farrer explained that Hargrove's disorders are longstanding and require intense treatment.  Tr. 470.  She indicated that Hargrove generally spoke slowly and engaged in limited conversation, her mood was usually severely depressed, and her affect typically restricted.  Tr. 468.  She stated that Hargrove "reports that she rarely goes out of her house unless she has to," always sits facing the door, and "jumps" when someone walks behind her in a hallway.  Tr. 468.  She opined that Hargrove's insight and judgment are fair to poor, but that her thought process and orientation are intact.  Tr. 468.  She has difficulty concentrating and remembering due to anxiety and depression.  Tr. 468, 470.  She can follow directions.  Tr. 470. Dr. Farrer noted that Hargrove has limited interaction with others, little support, extreme difficulty "adapting to new situations," and would be impeded by small pressures.  Tr. 470.

On June 3, 2013, Dr. Farrer completed a Mental Residual Functional Capacity ("RFC") Questionnaire on behalf of Hargrove.  Tr. 617-622.  Dr. Farrer listed Hargrove's symptoms: anhedonia, decreased energy, thoughts of suicide, generalized persistent anxiety, difficulty thinking or concentrating, pathologically inappropriate suspiciousness or hostility, sleep disturbance, and emotional withdrawal or isolation.  Tr. 618.  Dr. Farrer opined that Hargrove's PTSD symptoms greatly interfered with her attention span because she was constantly scanning the environment for trauma cues.  Tr. 620.  She was "very jumpy" and had a hard time focusing and sustaining attendance when she was around others.  Tr. 620.  She would be unable to complete a normal workday and workweek without interruptions from psychologically based symptoms.  Tr. 619.  Her severe depression and PTSD symptoms would cause her difficulty working a regular job on a sustained basis.  Tr. 621.  Her thoughts interfered with her memory and she would need a familiar environment to interact appropriately.  Tr. 620.  Dr. Farrer opined that she would miss over four days of work per month.  Tr. 621.  Apart from a limited but satisfactory ability to set realistic goals and make independent plans, interact with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness, Dr. Farrer opined that Hargrove was seriously limited, unable to meet competitive standards, or had no useful ability to function in any of the remaining work-related areas on the form.  Tr. 619-620.  She stated that Hargrove might be able to reduce symptoms and function better with significant intensive therapy.  Tr. 617.

### 2.  State Agency Reviewers

On January 23, 2012, state agency psychologist Karla Voyten, Ph.D., reviewed Hargrove's record.  Tr. 60-68.  Dr. Voyten gave great weight to Dr. Baishnab's opinion and controlling weight to Dr. Farrer's 2011 opinion.  Tr. 66.  Based on her review of the records, Dr.

Voyten opined that Hargrove had mild limitations in activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no extended episodes of decompensation.  Tr. 65.  She concluded that Hargrove could "concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions," but not detailed or complex/technical instructions.  Tr. 68.  Her ability to maintain persistence and pace to complete such tasks was not significantly impaired.  Tr. 68.  She had an adequate ability to handle brief and superficial contact with coworkers and the public and would be able to handle ordinary levels of supervision in a work setting.  Tr. 68.  She remained capable of handling the stresses of a routine, repetitive, 3-4 step work setting.  Tr. 68.

On July 18, 2012, state agency psychologist Paul Tangeman, Ph.D., reviewed Hargrove's record and affirmed Dr. Voyten's opinion.  Tr. 86-94.

### D.  Testimonial Evidence

### 1.  Hargrove's Testimony

Hargrove was represented by counsel and testified at the administrative hearing.  Tr. 31-50.  She discussed her past work with the ALJ.  Tr. 33-39.  She used to work as a cashier at a corner store owned by her cousin's boyfriend on and off for five years but left because people were shooting and robbing the store.  Tr. 34.  She performed office work through a temp agency and worked as a telemarketer for three or four months but quit because she "just couldn't do it anymore."  Tr. 35.   She tutored two children for two hours a day at their home; she stopped tutoring because she was not getting paid.  Tr. 36-37.  She babysits up to three children three or four times a month.  Tr. 37-38.  She has had three job interviews; two of them took place over the telephone.  Tr. 39-40.

11

Hargrove testified that she lives by herself and has done so for about six years. Tr. 40. She has never been married and has no children.  Tr. 41.  Her friend, whom she sees about twice a week, dropped her off at the hearing.  Tr. 41.  She is able to drive and usually drives to the grocery store if she can get someone to go with her.  Tr. 41.  During the day, when she is not babysitting, she does "nothing."  Tr. 41.  She likes to put puzzles together but currently had no puzzles.  Tr. 42.  She has gone to sporting events with other people.  Tr. 42.  She went to a professional football game and watched from the stands for about thirty minutes, then went to the bathroom and finished watching the game from there on the television.  Tr. 42.  She explained that there were a lot of people and the man sitting next to her kept touching her.  Tr. 42.  She went to her nephew's ball games a few times but did not stay for the whole game.  Tr. 43.  She explained that she goes to the games because she is sad that she never goes to anything.  Tr. 43. She likes the Pittsburgh Steelers and watches their games on television.  Tr. 44.

Hargrove stated that she cannot work because she is scared being around people.  Tr. 44. She is comfortable around children and feels "okay" around them.  Tr. 45.  She has an associate's degree in medical billing and stated that she could perform that kind of a job from home because there are no people there.  Tr. 46.

Hargrove testified that she does not sleep well at night and is usually up all night.  Tr. 47. She does not leave the house much; when she sees friends, they mostly come to her house.  Tr. 48.  She stated that she does not eat.  Tr. 48.  She bathes and puts on clean clothes about every four or five days.  Tr. 48.  She is tearful on a daily basis and was tearful at the hearing.  Tr. 43, 49. She likes to stay in her room.  Tr. 49.

## 2. Vocational Expert's Testimony

Vocational Expert Lynn Smith ("VE") testified at the hearing.  Tr. 50-54.  The ALJ discussed with the VE Hargrove's past work as a babysitter, sales clerk, telemarketer, and office clerk.  Tr. 50-51.  The ALJ asked the VE to determine whether a hypothetical individual of Hargrove's age, education and work experience could perform the work she performed in the past if that person had the following characteristics: can perform work at all exertional levels, can perform simple, routine, and repetitive tasks in an environment free of fast-paced production requirements and involving only simple work-related decisions and routine workplace changes; can have occasional interaction with coworkers but her contact would be superficial, i.e., no negotiation or confrontation with others.  Tr. 51.  The VE answered that such an individual could perform Hargrove's past work as an office clerk.  Tr. 51.  The ALJ asked the VE whether there were other jobs in the national economy that the individual could perform.  Tr. 52.  The VE replied that the individual could perform work as a laundry worker (1,200 local jobs; 4,000 Ohio jobs; 410,000 national jobs), kitchen helper (4,000 local jobs; 20,000 Ohio jobs; 500,000 national jobs), mail clerk (1,400 local jobs; 4,000 Ohio jobs; 80,000 national jobs), and office worker (6,000 local jobs; 20,000 Ohio jobs; 800,000 national jobs).  Tr. 52.

Next, the ALJ asked the VE if the individual could still perform the jobs mentioned if the individual could have no interaction with the public.  Tr. 52.  The VE stated that such an individual could still perform the jobs mentioned.  Tr. 52.  The ALJ asked the VE to what extent an individual could be off task and still be able to maintain the jobs mentioned.  Tr. 52.  The VE answered that an individual could be off task usually ten percent of the time or less.  Tr. 52.  Lastly, the ALJ asked the VE how many times a person could be absent from work per month and still be able to maintain the jobs mentioned.  Tr. 53.  The VE stated that a person could be absent two days a month and still maintain the jobs mentioned.  Tr. 53.

Next, Hargrove's attorney asked the VE whether a hypothetical individual could perform Hargrove's past work or any other work if that individual was unable to do the following: meet competitive standards in terms of maintaining attendance or sustaining an ordinary work routine without special supervision, perform at a consistent pace, request assistance, accept instructions and respond appropriately to criticism, and get along with coworkers.  Tr. 53.  The VE answered that such an individual could not perform Hargrove's past work or any other work.  Tr. 53-54.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

14

listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ
       must assess the claimant's residual functional capacity and use it to
       determine if claimant's impairment prevents him from doing past relevant
       work.  If claimant's impairment does not prevent him from doing his past
       relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if,
       based on his vocational factors and residual functional capacity, he is
       capable of performing other work that exists in significant numbers in the
       national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his December 4, 2013, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security
       Act through September 30, 2012.  Tr. 14.

2.     The claimant has not engaged in substantial gainful activity since
       December 19, 2009, the alleged onset date.  Tr. 14.

3.     The claimant has the following severe impairments: major depressive
       disorder, posttraumatic stress disorder, and anxiety disorder.  Tr. 14.

4.     The claimant does not have an impairment or combination of
       impairments that meets or medically equals the severity of one of the
       listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 15.

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.      The claimant has the residual functional capacity to perform a full range
of work at all exertional levels but with the following nonexertional
limitations: the claimant can perform simple, routine, and repetitive tasks.
The work environment must be free of fast-paced production
requirements, involve only simple work related decisions, and only
routine work place changes.  The claimant can occasionally interact with
the public and co-workers.   Tr. 16.

6.      The claimant is unable to perform any past relevant work.  Tr. 19.

7.      The claimant was born on September 11, 1972 and was 37 years old,
which is defined as a younger individual age 18-49, on the alleged
disability onset date.  Tr. 19.

8.      The claimant has at least a high school education and is able to
communicate in English.  Tr. 19.

9.      Transferability of job skills is not material to the determination of
disability because using the Medical-Vocational Rules as a framework
supports a finding that the claimant is "not disabled," whether or not the
claimant has transferable job skills.  Tr. 19-20.

10.     Considering the claimant's age, education, work experience, and residual
functional capacity, there are jobs that exist in significant numbers in the
national economy that the claimant can perform.  Tr. 20.

11.     The claimant has not been under a disability, as defined in the Social
Security Act, from December 19, 2009, through the date of this decision.
Tr. 20.

## V. Parties' Arguments

Hargrove objects to the ALJ's decision on two grounds.  She argues that the ALJ erred at

Step Three when he failed to find that Hargrove met or equaled Listings 12.04 (Affective

Disorders) and/or 12.06 (Anxiety Related Disorders) and that the ALJ did not follow the treating

physician rule with respect to Dr. Farrer's opinion.[4]  Doc. 15, pp. 6-15.  In response, the

---

[4] Hargrove also asserts that, following the Hearing (wherein Hargrove's counsel remarked that she would
"entertain" an amended onset date (Tr. 57)), the ALJ's staff "contacted Plaintiff's counsel and inquired whether
Plaintiff would consider amending the alleged onset date from December 19, 2009 to August 29, 2012."  Doc. 15,
p. 4.  After discussions with Hargrove, Hargrove's counsel provided a memorandum to the ALJ requesting that he
consider October 14, 2010, as her amended onset date.  *Id.*  Hargrove states that she did not receive any
communication thereafter until the ALJ's unfavorable decision and complains that this is "patently unfair and
prejudicial" to her.  *Id.*  Beyond complaining about these communications, Hargrove does not present an argument

Commissioner submits that substantial evidence supports the ALJ's Step Three determination and that he did not err when assigning weight to Dr. Farrer's opinion.  Doc. 19, pp. 10-18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err in his Step Three finding that Hargrove did not meet or equal Listings 12.04 or 12.06

Hargrove argues that the ALJ provided only "a cursory analysis of the evidence in determining whether [her] impairment(s) meet, or at least equal in severity, the criteria of Listing Section 12.04 and/or 12.06."  Doc. 15, p. 6.  She asserts that the ALJ only cited one piece of evidence—Dr. Baishnab's opinion—in finding that Hargrove did not satisfy the paragraph B criteria in Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders).  Doc. 15,

---

related to this issue, nor is it raised as a reason for reversal.  According, the undersigned does not consider Hargrove's complaints.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." ) (internal citations omitted).

p. 11.  She argues that there is compelling evidence in the record that she satisfies the paragraph A and B criteria in both Listings 12.04 and 12.06.  Doc. 15, pp. 10-12.

The ALJ found that Hargrove did not satisfy the paragraph B criteria; accordingly, she could not show that her impairments met or equaled Listings 12.04 or 12.06.[5]  *See* 20 CFR Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06.  To satisfy the paragraph B criteria in both Listings, a claimant must show at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id*.  The ALJ found that Hargrove had moderate restrictions in daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation and, therefore, did not satisfy the B criteria of Listings 12.04 or 12.06.  He explained,

> In activities of daily living, the claimant has moderate restriction.  The claimant lives alone in an apartment and has no problems with her personal care.  She is able to prepare meals and prepare food.  She does not like to go shopping, but she attends her doctors' appointments (4F/7).
>
> In social functioning, the claimant has moderate difficulties. The claimant has issues with socializing due to fear of others and lack of trust.  In the work setting, she had minimal socializing but was compl[ia]nt with work expectations.  She does spend some time with family and friends (4F/6).  She sees a friend twice a week and enjoys being around children.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  She is able to drive and do banking and bill paying.  She does some tutoring and enjoys puzzles (4F/7).

Tr. 15-16.

---

[5]  To meet or medically equal Listing 12.04, a claimant must satisfy both the paragraph A and B criteria, or, in the alternative, the paragraph C criteria.  *See* 20 CFR Pt. 404, Subpt. P, App. 1, Listing 12.04.  For Listing 12.06, a claimant must satisfy the paragraph A and B criteria or the paragraph A and C criteria.  The ALJ found that Hargrove did not satisfy the paragraph C criteria (Tr. 16); Hargrove does not allege error with respect to this finding or argue that she satisfies the paragraph C criteria as to either Listing.

Hargrove argues that the ALJ erred because, in support of his finding that she did not meet the paragraph B criteria, he cited "only one piece of evidence"—Dr. Baishnab's opinion. Doc. 15, p. 11.  Hargrove does not cite legal authority for her apparent argument that an ALJ is required to cite more than one piece of evidence in the record.  Legal authority indicates otherwise.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

Hargrove next argues that the ALJ's analysis is flawed because Dr. Baishnab's opinion "provides much more evidence of the severity of her condition than the ALJ chose to rely upon." Doc. 15, p. 12.  She submits that Dr. Baishnab's opinion also noted that she suffers from panic attacks, is hypervigilant, has severe anxiety, difficulty being around others, and avoids people, and described her as "fragile."  Doc. 15, p. 12.  Again, the fact that the ALJ did not cite all the comments contained in Dr. Baishnab's four-page opinion does not render the ALJ's decision faulty.  Moreover, elsewhere in his decision, the ALJ discussed many of Hargrove's symptoms that she complains he did not consider.  *See Bledsoe v Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (an ALJ does not err by not spelling out every consideration that went into her Step Three determination when, elsewhere in her opinion, she describes her factual findings).  For example, the ALJ observed that medical records repeatedly described Hargrove as tearful and that she displayed hypervigilance and anxiety throughout her counseling sessions.  Tr. 17-18. The ALJ explained that, despite this and other problems Hargrove had that were reflected in her treatment notes, she was also repeatedly described as cooperative and had managed to do all of the following: live on her own, work at a store part time, work at an externship five days a week, finish a degree program, attend sporting events (albeit for shorter periods of time), spend time

with family and friends, go to job interviews, have family over to her house for Christmas (although she was "ready for them to leave after a while"), spent time baby sitting and enjoyed being with children, spent time tutoring children, went grocery shopping, attended a festival and "had a great time," and reported that she felt happier when she engaged in activities with others. Tr. 17-19.  He remarked that Dr. Baishnab stated that Hargrove was "fragile when with others" but that he also stated that she is "proficient when alone."  Tr. 18.  He explained that Dr. Baishnab found that, in a work setting, Hargrove engaged in minimum socializing but was nevertheless compliant with work expectations.  Tr. 15.  Dr. Baishnab opined that Hargrove's abilities to remember, understand and follow directions, maintain attention, sustain concentration, persist at tasks, and complete tasks in a timely fashion are "intact"; the ALJ gave Dr. Baishnab's opinion "significant" weight.   Tr. 18, 584.  That Hargrove believes Dr. Baishnab's questionnaire can be read to support a finding that her impairments are more severe, i.e., marked in more than two of the three paragraph B criteria, does not render the ALJ's decision improper when substantial evidence supports the ALJ's decision.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

Furthermore, state agency psychologists Voyten and Tangeman both gave Dr. Baishnab's opinion great weight and, with respect to the paragraph B criteria for Listings 12.04 and 12.06, found that Hargrove was mildly restricted in her activities of daily living and moderately restricted in maintaining social functioning and concentration, persistence or pace.  Tr. 65-66; 90-92.  The ALJ gave these opinions "significant" weight.  And he further modified his

paragraph B criteria finding to be even more restrictive than Drs. Voyten and Tengman when he concluded that Hargrove was moderately impaired in her activities of daily living.  Tr. 15, 19.

In sum, the ALJ's decision shows a thorough review and analysis of the evidence in the record; he compared the evidence to Listings 12.04 and 12.06 and he provided sufficient explanation so as to accommodate meaningful judicial review, and his finding that Hargrove did not satisfy the paragraph B criteria is supported by substantial evidence.  *See Reynolds v. Comm'r of Soc. Sec*., 424 Fed. App'x 411 (6th Cir. 2011) ("In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.").  Accordingly, the ALJ's decision must be affirmed.

### B.  The ALJ properly considered Dr. Farrer's opinion

Hargrove argues that the ALJ's finding that the opinion of her treating physician, Dr. Farrer, was entitled to "limited weight" is not supported by substantial evidence.  Doc. 15, pp. 14-15.[6]  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider

---

[6]  Hargrove frames her second issue as follows: "Step 5: The ALJ erred in finding that Plaintiff is capable of performing jobs that exist in significant numbers in the national economy."  Doc. 15, p. 13.  However, her argument presented is that the ALJ erred when assessing Dr. Farrer's opinion.  *See* Doc. 15, pp. 13-15.

factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ gave "limited weight" to Dr. Farrer's opinion.  Tr. 19.  He summarized her opinion, including her finding that Hargrove has many serious limitations and is unable to meet competitive standards in some areas of work-related functioning, and explained,

> This opinion is given limited weight.  While the claimant does experience symptoms of depression and anxiety, the records reflect that she has reported that she feels happier when engaging in activities with others, as she reported when she had attended a weekend festival.  The medical records and her daily activities suggest that she can interact with others on an occasional basis, and she is able to do simple, routine, and repetitive tasks, provided that the work environment is fairly static with few pressures.

Tr. 19.  The ALJ was not required to give Dr. Farrer's opinion controlling weight because he found it to be inconsistent with other substantial evidence in the record, as he sufficiently described here and elsewhere in his opinion (as detailed by the undersigned in the section above).  *See Wilson*, 378 F.3d 544.

Moreover, the ALJ limited Hargrove to occasional interaction with others and the public; Hargrove does not explain how this limitation is inconsistent with Dr. Farrer's opinion that Hargrove had a hard time focusing and sustaining attendance around others, as Hargrove appears to assert.[7]  Doc. 15, p. 14.  The ALJ was not required to credit Dr. Farrer's opinion that Hargrove is incapable of work on a sustained basis because the ultimate issue of disability is reserved to the Commissioner.  *Kidd v. Comm'r of Soc. Sec.*, 283 Fed. App'x 336, 341 (6th Cir. 2008).

---

[7]  Hargrove complains generally that the ALJ did not give "great weight" to Dr. Farrer's "opinion," but does not identify a particular portion of the opinion or explain how the ALJ's RFC assessment does not adequately account for the limitations described in Dr. Farrer's opinion.

Finally, Hargrove's recitation of evidence in the record that purports to support Dr. Farrer's other assessed limitations (Doc. 15, pp. 14-15) is unavailing; the standard is not whether evidence supports a different conclusion than the ALJ's decision, but whether substantial evidence supports the ALJ's decision. *See Jones*, 336 F.3d at 477. As explained above, substantial evidence supports the ALJ's decision and his decision must be affirmed.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.


Dated: January 20, 2016

_____
Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)

23